East Jersey Iron Co. *v.* Wright.

---

THE EAST JERSEY IRON COMPANY

*v.*

EDWARD H. WRIGHT.

1. A contract giving a party an exclusive right to dig ore in certain lands, no estate or interest in the land being granted, is a license and not a grant or demise.

2. A license is an authority to go upon the land of the licensor and do an act or series of acts there, but passes no estate or interest in the land.

3. Unless coupled with an interest, or an equity has been created by acts done in pursuance of a license, a license is always subject to revocation in either of the following methods: (1), by the will of the licensor; (2), by the death of either of the parties, or (3), by a conveyance of the land upon which it was intended to operate.

4. Where a mining license is granted by a licensor, for the purpose of having his lands explored and their mineral resources developed, and it contains a provision that if the licensee concludes to abandon digging ore, he shall notify the licensor, if the licensee, after making an opening in the lands and finding a large deposit of ore, does in fact abandon the enterprise, because the ore is comparatively valueless, he

East Jersey Iron Co. *v.* Wright.

will be held to have abandoned the mine, though he gave no formal notice.

5. His conduct, under such circumstances, constitutes the best sort of notice.

---

On final hearing on bill and answer, and on cross-bill and answer, and supplemental bill and answer, and proofs under all the bills.

*Mr. Thomas N. McCarter* and *Mr. Cortlandt Parker*, for complainants.

*Mr. Joseph D. Bedle,* for defendant.

The Vice-Chancellor.

The controversy in this case is presented in a two-fold aspect. The East Jersey Iron Company, claiming to be in the rightful possession of an iron mine opened by them in certain lands located in the county of Sussex, have filed a bill, asking that the defendant Wright may be enjoined from asserting any right to the mine, or claiming any interest therein, under a paper in their bill called a lease; and, also, that this paper may be declared to be of no force or validity against them, and ordered to be cancelled.

Wright, by both answer and cross-bill, asserts that the paper which his adversaries seek to have adjudged worthless, is not only valid and effectual, but confers upon him an exclusive right to dig ore in the mine in dispute, and, by his cross-bill, he asks that his adversaries may be restrained from all further working of the mine, and be decreed to surrender the possession of it to him, and to account to him for the ore they have taken therefrom. Wright has also filed a supplemental bill, which, under the conclusion I have reached upon the main issue, it is neither necessary to analyze nor consider.

It is thus seen that the litigants assert rival rights to take ore from the same mine. Each claims a superior and exclu-

sive right. Both parties claim under John I. Williams. Wright's claim is founded on an agreement, under seal, made by John I. Williams with Abram Rude, bearing date March 24th, 1857, whereby Williams, for himself, his heirs, executors, administrators and assigns, agreed with Rude, his heirs, executors, administrators and assigns, that he and they should have the exclusive right and privilege of raising and removing ores from certain lands belonging to Williams, situate in the township of Vernon, in the county of Sussex, together with the privilege of entering into and upon said lands for the purpose of raising and removing ore, and, also, for the purpose of erecting such buildings and machinery as might be necessary for carrying on the mining business. Williams, in addition, granted to Rude the privilege of cutting timber for the use of the mine, without charge. Rude agreed to pay Williams twenty-five cents a ton for all good ore sold and removed from the mine by their joint consent. The agreement further provided that, in case Rude should conclude to abandon getting ore, he should give Williams notice.

Immediately after the execution of this paper, Rude says he made an opening in the lands described in it, about ten feet deep, exposing from twelve to eighteen feet of ore, and removed about ten tons of ore. He has dug no ore since, and no further mining operations have been carried on under his paper. None of the ore raised by Rude was sold. Neither Williams, nor those who have succeeded to his rights, have derived a penny's profit or advantage from the paper. Rude transferred his rights, under this paper, to John H. Brown, on the 13th of March, 1873, and Brown assigned them to Wright, July 7th, 1875.

The origin of the rights claimed by the East Jersey Iron Company, is an agreement made by John I. Williams with Oliver Ames, Oakes Ames and Oliver Ames, jr., bearing date the 5th day of April, 1860, whereby Williams agreed, for himself, his heirs and assigns, to give to the Ameses, their successors or assigns, the exclusive right to all the iron ore

East Jersey Iron Co. *v.* Wright.

on any land owned by him (excepting only a right of Abram Rude to a shaft made by him to the extent of such shaft on the surface of the ground), together with the right of digging and removing the same. The agreement also provided that the Ameses should have the right to erect such works and buildings as were necessary in conducting their business, and, in case they abandoned the mine, to remove their machinery; they were also given the right to use timber, growing near the mine, for the purpose of timbering their shaft and other necessary purposes. It was also provided that, in case Williams sold any of his lands, he should reserve the minerals for the benefit of the Ameses. The Ameses agreed to pay twenty-five cents a ton for all ore raised and removed, to keep correct accounts of the quantity raised and removed, and to make semi-annual payments. The agreement also required the Ameses to raise and remove fifty tons of ore annually, or to pay tonnage on that quantity, and, in case that quantity was not raised or tonnage on that quantity paid, that the agreement should become void.

It is undisputed that the tonnage or royalty required by this agreement has been paid and accepted by the party entitled to it, and that whatever rights were created by it have, so far as they affect the lands in controversy, been transferred to the East Jersey Iron Company. The agreement was assigned to them in September, 1873. John I. Williams conveyed the lands containing the ore in dispute to his son, Isaac Williams, on the 12th of May, 1864. He took possession at once. John I. Williams died subsequently. After the East Jersey Iron Company acquired the rights conferred upon the Ameses by this agreement, they entered upon the lands containing the ore in dispute, and proceeded to develop a mine. They expended a considerable sum of money in its development, and they have established the fact that the mineral deposit in these lands is valuable, both in respect to its quality and quantity. Their possession and mining operations, must, in this con-

East Jersey Iron Co. *v.* Wright.

troversy, be assumed to have been lawful and rightful against everybody except the parties to this suit, who challenge them, and claim that they were invasions of their rights. They must be assumed to have been rightful against the owner of the land.

This brings us to the decisive question of the case : What is the legal operation of the Rude agreement? Is it a grant, a lease, or merely a license? The language, it will be observed, is purely promissory or executory: "It is agreed that Rude, and those who succeed to his rights, shall have the exclusive right and privilege &c." Nothing passes presently as under technical words of grant, *dedi et concessi.* To constitute a grant, it is not indispensable that technical words shall be used, but they must be words which will manifest the same intention. No such words are found here. The language of this instrument is equally inefficacious to manifest a purpose to make a demise. The technical words of a lease are "demise, lease and to farm let;" but any others, signifying the same intention, will have the same effect. But they must clearly show that the lessor intends to divest himself of possession, and that the lessee shall come into it.

In *Hanley* v. *Wood, 2 Barn. & Ald. 724*, the instrument employed was a deed, and by it the grantor granted unto the grantee and his assigns free liberty, license, power and authority to dig, raise, mine and sell all metals and minerals whatsoever which should be found in certain lands of the grantor. It was held that the deed merely granted a license to dig ore, and to take such as the licensee should separate from the freehold, but that the grantee acquired no estate in the land, nor in the ore deposited therein until he had severed it from its connections.

The instrument used in *Funk* v. *Haldeman, 53 Pa. St. 229*, was a deed, by which the grantor bargained and sold unto the grantee and his heirs, the free and uninterrupted use and privilege of entering upon the lands of the grantor, to prospect and dig for ore, and to take and sell the same.

East Jersey Iron Co. *v.* Wright.

This language, it was held, amounted neither to a lease nor to a sale of the land, nor to a sale of any of the minerals in the lands. Many other adjudications, adopting the same construction, might be cited, but the meaning of instruments, couched in such language, can scarcely be regarded as a debatable matter.

By force of the words of the instrument under consideration, unless we attribute to them a significance much more extensive than that they have in legal science, or can have in virtue of their own intrinsic force, it is plain they pass no estate or property in the lands or the minerals deposited in them. They, at most, merely gave Rude authority—we may say exclusive authority—to enter upon the lands of Williams and to do a series of acts there for his own profit, without passing any estate or property in the lands. Such an authorization is a license and not a lease. *Richman* v. *Baldwin, 1 Zab. 390; Cook* v. *Stearns, 11 Mass. 537; 3 Kent's Com. 452.*

"A license to work a mine," says Bainbridge, " differs from a lease in this: A license simply confers a right of property in the minerals when they have been severed from the freehold, while a lease is a conveyance of an actual interest in the thing demised." *Bainb. on Mines 117.* The Rude agreement, in my judgment, simply conferred a license.

A license, pure and simple, is a mere personal privilege; it doth extend but to him to whom it was given, and cannot be granted over. *Prince* v. *Case, 10 Conn. 375; Jackson* v. *Babcock, 4 Johns. 417; Howes* v. *Ball, 7 Barn. & Cress. 481.* Even when money has been paid for it, it is revocable, at law, at the pleasure of the licensor. *Hetfield* v. *Central R. R. Co., 5 Dutch. 221; S. C., Id. 571.* The death of either of the parties will terminate it. *Johnson* v. *Carter, 16 Mass. 443; Ruggles* v. *Lesure, 24 Pick. 187.* Even when under seal, the licensor may revoke it at will. *2 Am. Lead. Cas. 376; Wood* v. *Leadbitter, 13 M. & W. 845.* And when it affects lands, a conveyance of them will revoke it. *Cook* v.

*Stearns, 11 Mass. 538; Stevens* v. *Stevens, 11 Metc.* (*Mass.*) *251; Wallis* v. *Harrison, 4 M. & W. 538.*

These rules do not, however, apply when an interest is coupled with the license, or an interest is created by an execution of the license. To illustrate: If A. sells a chattel, situated on his lands, he may, by express words, authorize the purchaser to enter and remove it, or permission to do so will be implied necessarily from the transaction. In either case the license to the purchaser to go and remove his property is irrevocable, otherwise the vendor might, by simply exercising his power of revocation, defeat a title he had just made. And so a license, giving the licensee the right to cut a tree on the land of the licensor, and carry it away, or to dig ore in his mine and remove it, becomes irrevocable after the tree is cut, or the ore is dug, otherwise the licensor might practice a ruinous fraud upon his licensee, by exercising his power of revocation at that point in the transaction where he would derive the most advantage himself and inflict the greatest injury upon his licensee. Except in these cases, and others like them, where it appears that the authority or privilege given has been so far executed that its withdrawal will amount to a fraud, a license, whether created by parol or by writing under seal, is always subject to be revoked in either of the modes already indicated. Under our system of real property law, no other rule can be tolerated. Even when this court interferes to prevent the revocation of a license partially executed, it gives relief only upon equitable terms. *Trenton Water Power Co.* v. *Chambers, 1 Stock. 471.*

The adjudications upon this subject are numerous and discordant. Taken in their aggregate, they cannot be reconciled, and if an attempt should be made to arrange them into harmonious groups, I think some of them would be found to be so eccentric in their application of legal principles, as well as in their logical deductions, as to be impossible of classification. But the doctrine just stated, I think, must be regarded as the plain result of the decided

East Jersey Iron Co. *v.* Wright.

weight of authority, and as a necessary and natural sequence of certain established principles of real property law. *2 Am. Lead. Cas. 738 et seq. ; Thomas v. Sorrell, Vaugh. 351 ; Wood v. Leadbitter, 13 M. & W. 845 ; Funk v. Haldeman, 53 Pa. St. 229.*

A license may confer either a sole or exclusive right, or simply a right in common. If it simply confers a right to dig and take ore, or to work a mine, it is not exclusive, and the licensor may himself take ore from the same land or mine, or license others to do so. And when it authorizes the licensee to dig and carry away all the ore to be found in certain lands, it does not confer an exclusive right. If it be merely a license, and no estate or property in the land is passed, the licensee acquires no title to the ore until he has severed it. Such a license has been adjudged to confer a privilege similar to a right of common *sans nombre*—to give a right without stint as to quantity, but not exclusive of the grantor. The authorities supporting this view will be found cited in *Silsby v. Trotter, 2 Stew. 223.* There can be no doubt that the instrument under consideration conferred an exclusive right. The licensor has expressed his intention in that respect in plain words. He agreed that Rude should have the exclusive right and privilege of raising and removing ore. This unquestionably gave Rude an exclusive right so long as his license continued in force. It may be laid down as a general rule, that if it appears to be the intention of a deed of grant or license, that the grantee should be solely and exclusively entitled to work for minerals, the grantor will be precluded from afterwards abridging or derogating from his grant by any attempt to exercise a right incompatible with his former disposition. *Bainb. on Mines 269.* But did Rude's license continue in force after Williams parted with the lands upon which it was intended to operate ? No reservation of his rights was made; at least none has been shown. By force of his license he acquired no estate, interest or term in the lands. His right consisted of a bare, naked authority to go upon them and dig and

remove ore. He had no possession, and was invested with no right to possession which was sufficient to be the foundation of an action of ejectment. His license was unexecuted; he obtained it without paying a consideration for it, and had done nothing under it which rendered its revocation, either as a matter of law or conscience, unfair or unjust. If his license invested him with no estate or interest in the lands, and no equities have been raised in his favor by the expenditure of money or labor under it, it is difficult to understand by force of what legal or equitable rule it can be said to possess the least efficacy, after the person who granted it has ceased to have any interest in or dominion over the lands upon which it was intended to operate.

It seems to me to be incontestably true, as a legal proposition, that the moment a licensor divests himself of his whole estate in the land, and his dominion over it ceases, any permission or authority granted by him to do acts upon the land, not resting in grant or demise, nor coupled with rights or equities arising out of acts done in pursuance of such permission or authority, must also cease.

But a more decisive consideration remains to be noticed. The Rude license was conditional; if he concluded to abandon the getting of ore he was to give notice. This provision, as well as the general scheme of the instrument, shows that it was the intention of the parties that the continuance of Rude's privilege was to depend on the fact that he dug and removed ore. It is clear that the rights and relations of the parties were not to remain the same after notice that they were before notice; the notice was not intended to be an unmeaning ceremony, which should leave the parties just where they were before it was given, and yet it is not expressly said that the effect of the notice should be to end Rude's privilege. Such, however, was undoubtedly the meaning of the parties. If we pay any attention to the general design of the instrument, the nature of the property which was the subject matter of the arrangement, the situation and relation of the parties, and

East Jersey Iron Co. *v.* Wright.

the character of the privilege granted, it is impossible to believe that Williams intended to give to Rude an exclusive and irrevocable privilege to take ore from his lands, which Rude might exercise or not, just as he pleased, and if he chose not to exercise it, that his arbitrary choice in the matter should have the effect of preventing Williams, forever, from developing the mineral resources of his land. Williams's object was undoubtedly just the reverse of this. His purpose was to have his lands explored and their mineral resources developed, not to grant a privilege which could be used to clog their development. That Rude understood that this was Williams's purpose, I think there can be no doubt. The discovery and mining of ore was manifestly the design of both parties, and their contract relations and duties were to cease when that purpose was abandoned. Rude had a right to terminate the arrangement at any time, *after he had concluded to abandon the getting of ore*, by notice either verbal or written. Abandonment was the essential operative fact, not notice. That was merely the means by which the fact of abandonment was to be communicated to Williams. Rude could not abandon the getting of ore and still retain his privilege. His right did not depend upon his will, but upon the fact that he dug and removed ore. His contract gave him no right to say, " I will abandon the getting of ore for the present, but not finally; I may resume after the lapse of ten or fifteen years." A failure to take any ore for that period was abandonment, unmistakable and absolute. The continuance of his license depended on his acts and not on his will, and in trying to ascertain whether he concluded to abandon the getting of ore or not, his conduct, and not his words or mental purposes, must be the test.

Upon the facts, as he states them himself, there is no room for dispute or diversity of opinion. As already stated, in 1857, he made an opening, about ten feet deep, in the lands covered by his license, and removed about ten tons of ore, and then abandoned work and has done nothing since.

17

He found ore in abundance, but of a kind then regarded as comparatively valueless. He abandoned the enterprise because it was profitless. There can be no doubt about what his conduct meant. It was of itself, and in itself, actual, open and notorious abandonment, and amounted to notice of the most emphatic sort. In my view, there is little appearance of justice in the claim that now, since a similar enterprise, undertaken at the risk of other parties and carried on with their money, has been made successful, those who claim to have succeeded to Rude's position, should be permitted to come in and repudiate his abandonment, and set up a stale right and take to themselves the whole profit of the venture.

Said Lord Eldon, in *Norway* v. *Rowe, 19 Ves. 144:* "A licensee who stands by and suffers another to incur great expense and risk in developing a mine, without asserting any claim until the experiment has proved a success, presents a claim not to be admitted in a court of equity." "A mine," he further said, "frequently remains in the most hopeless state for years, and may at last be rendered profitable by an adventurous speculator. Such speculations are always very hazardous. Perhaps, when you think you have a golden prospect, the whole thing fails. I have known a copper mine, producing one week at the rate of £20,000 a year, and the next week worth nothing. There are persons who will stand by and see large expenditures incurred in such operations, intending, if the venture turns out successful, to set up a claim, but if otherwise, to have nothing to do with it. Such persons have no right to the aid of a court of conscience."

In my judgment, the Rude license is without any virtue or force whatever, having been revoked by the licensor and abandoned by the licensee. The East Jersey Iron Company are entitled to a perpetual injunction, and the cross-bill of Wright must be dismissed. The East Jersey Iron Company are entitled to costs on both decrees.